## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF GEORGIA
## AUGUSTA DIVISION

| | | |
|---|---|---|
| SOUTHERN FELT COMPANY, INC., | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CV 119-200 |
| | * | |
| MICHAEL KONESKY, | * | |
| | * | |
| Defendant. | * | |

## O R D E R

Before the Court is Defendant Michael Konesky's ("Defendant") partial motion for summary judgment. (Doc. 26.)  The Clerk of Court gave Plaintiff Southern Felt Company, Inc. ("Plaintiff") timely notice of Defendant's motion, the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. 27.)  Therefore, the notice requirements of Griffith v. Wainwright, 772 F.2d 822, 825 (11th Cir. 1985) have been satisfied.  For the following reasons, Defendant's partial motion for summary judgment (Doc. 26) is **DENIED.**[1]

---

[1] Defendant also moved for a hearing in connection with his motion for summary judgment. (Doc. 48.)  Finding a hearing unnecessary to resolve Defendant's motion, the Court **DENIES** Defendant's motion for a hearing.  See LR 7.2, SDGa.

## I. BACKGROUND

### A. The Parties

Plaintiff is a South Carolina corporation with its principal place of business in North Augusta, South Carolina. (Compl., Doc. 1, ¶ 6.) Plaintiff employed Defendant for over twenty years, and, at the end of his tenure, Defendant was the Vice President of Global Sales. (Id. ¶¶ 2, 14.) Defendant is a Georgia citizen who "provided services on behalf of [Plaintiff] in Georgia and South Carolina." (Konesky Decl., Doc. 26-2, ¶¶ 3, 6.)

### B. Lydall Purchased Plaintiff's Stock

In February of 2014, Lydall, Inc. purchased Plaintiff from Andrews Industries Ltd. through a stock acquisition thereby becoming Plaintiff's parent company. (Compl., ¶ 13; see also Konesky Dep., Doc. 42-7, at 99:10-14, 19-20.) Lydall is a Delaware corporation with its principal place of business in Manchester, Connecticut, and Lydall's General Counsel, Chad McDaniel, works in Connecticut. (McDaniel Aff., Doc. 42-5, ¶¶ 2-3, 7.)

### C. Employment Benefits Defendant Received

On February 21, 2014, Lydall granted Plaintiff restricted shares, and this "restricted stock grant was only given to specific members of management . . . as part of the acquisition of the stock of [Plaintiff], including [Defendant]." (Trinks Aff., Doc. 42-4, ¶¶ 6(a), 7.) This initial stock grant "had a more advantageous vesting schedule" than the remaining stock Defendant received

because it partially vested annually until fully vesting after three years. (Id. ¶¶ 8-9.) Thereafter, Lydall granted Defendant stock every December but that stock only vested at all after three years of continued employment. (Id. ¶¶ 9-10.) The dates for the December stock grants were: December 5, 2014; December 4, 2015; December 9, 2016; December 8, 2017; and December 7, 2018. (Id. ¶ 6(b)-(f); id., Exs. B-F, at 6-10.[2]) Only the initial stock grant and the first two December stock grants vested because Defendant resigned on October 16, 2019. (Id. ¶ 11.)

In addition, Lydall — through its CEO and Vice President of Human Resources, Dale Barnhart and William Lachenmeyer, respectively — signed off on a twenty percent pay raise for Defendant, which included the standard 3% annual increase and an additional 17% increase. (Pratt Aff., Doc. 42-3, ¶¶ 7, 15; id. Ex. G, at 24-25.) Of note, Messrs. Barnhart and Lachenmeyer approved both of Defendant's pay raises on December 18, 2014. (Id. ¶ 15.) Defendant also received other "benefits including car allowance payments, medical/dental benefits, wellness reimbursements for fitness equipment for he and his wife and a company gas card." (Pl.'s Resp. Opp'n Mot. for Summ. J., Doc. 42, at 12 (citing Pratt Aff., ¶¶ 6, 12(c)-(f); id. Exs. C, D, E, & F, at 8-23).)

---

[2] Because the Exhibits to affidavits and depositions are not separately filed, the Court uses the PDF page numbers CM/ECF supplies.

**D. Restrictive Covenant Agreement**

In 2014, the Parties negotiated and signed the "Confidentiality, Invention[,] and Non-Compete Agreement" ("Restrictive Covenant Agreement"). (Restrictive Covenant Agreement, Doc. 26-2, at 3-4.) On September 26, 2014, Plaintiff signed the Statement Verifying Receipt of New Hire Documents, acknowledging his receipt of the Restrictive Covenant Agreement. (Pratt Aff., ¶ 12(b); id. Ex. B, at 7.) Defendant then negotiated the substance of the Restrictive Covenant Agreement with Mr. McDaniel by sending a revised and signed version, which included removing the non-compete provision. (Konesky Dep., at 107:9-108:22; McDaniel Aff., ¶¶ 5-6.) Defendant signed the Restrictive Covenant Agreement on December 18, 2014. (Restrictive Covenant Agreement, at 4.) Mr. McDaniel reviewed and accepted the changes and executed the revised Restrictive Covenant Agreement in Connecticut. (McDaniel Aff., ¶¶ 5-9.)

The Restrictive Covenant Agreement contained two main provisions that are at issue: the Customer Non-Solicitation Agreement and the Employee Non-Solicitation Agreement: "[F]or a period of two (2) years following the termination of [Defendant's] employment," Defendant shall not:

> (i) induce or encourage any employee of [Plaintiff] to terminate his or her employment with [Plaintiff] [("Employee Non-Solicitation Covenant")], or

4

> (ii) solicit, induce[,] or encourage any person, business[,] or entity which is a supplier of, a purchaser from, or a contracting party with, [Plaintiff] to terminate any written or oral agreement, order[,] or understanding with [Plaintiff] or to conduct business in a way that results in an adverse impact to [Plaintiff] [("Customer Non-Solicitation Covenant")].

(Restrictive Covenant Agreement, ¶ 4.)  The Parties also provided that the Restrictive Covenant Agreement "shall be governed by and construed in accordance with the law of the State of Connecticut, the Company's[3] home office state."  (Id. ¶ 5.)

## E. Procedural Posture

On November 21, 2019, Plaintiff filed the present action. (See generally Compl.)  In his answer, Defendant raised a counterclaim claiming that "[t]he restrictive covenants contained in the [Restrictive Covenant] Agreement are unenforceable under Connecticut, South Carolina, and Georgia law."  (Def.'s Answer, Doc. 20, at 25; see generally id. at 25-32.)  On January 28, 2020, Defendant filed the present partial motion for summary judgment requesting that the Court grant summary judgment in his favor as to both his counterclaim and Plaintiff's breach of contract claim. (Def.'s Mot. for Summ. J., Doc. 26, at 1.)  Plaintiff responded (Pl.'s Resp. Opp'n Mot. for Summ. J.), and Defendant replied (Def.'s Reply Supp. Mot. for Summ. J., Doc. 45).  The motion is

---

[3] The Restrictive Covenant Agreement defines "the Company" as Southern Felt Company, Inc. (Restrictive Covenant Agreement, at 3.)  Lydall, Southern Felt's parent company, not Southern Felt, has its home office in Connecticut.

now ripe for consideration.  For the following reasons, Defendant's partial motion for summary judgment (Doc. 26) is **DENIED**.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Facts are "material" if they could "affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and a dispute is genuine "if the non[-]moving party has produced evidence such that a reasonable factfinder could return a verdict in its favor."  Waddell v. Valley Forge Dental Assocs., Inc., 276 F.3d 1275, 1279 (11th Cir. 2001).  The Court must view factual disputes in the light most favorable to the non-moving party, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted), and must "draw all justifiable inferences in [the non-movant's] favor."  United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (citation, internal quotation marks, and internal punctuation omitted).  The Court should not weigh the evidence or determine credibility. Anderson, 477 U.S. at 255.  But "[t]he mere existence of a scintilla of evidence in support of the [non-movant]'s position will be insufficient" for a jury to return a verdict for the non-moving party.  Id. at 252; accord Matsushita Elec. Indus.,

475 U.S. at 587 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted)); Gilliard v. Ga. Dep't of Corr., 500 F. App'x 860, 863 (11th Cir. 2012).

The moving party has the initial burden of showing the Court, by reference to materials in the record, the basis for the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Because the standard for summary judgment mirrors that of a directed verdict, the initial burden of proof required by either party depends on who carries the burden of proof at trial. Id. at 322-23. "When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it 'must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial.'" United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (emphasis omitted) (quoting Celotex, 477 U.S. at 331 (Brennan, J., dissenting)). Put another way, "the moving party must show that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non[-]moving party." Id. If the movant carries this burden, "it is entitled to summary judgment unless the non[-]moving party, in response, comes forward with significant, probative evidence demonstrating the existence

of a triable issue of fact." Id. (citation and internal quotation marks omitted).

When the movant does not bear the burden of proof at trial, it may carry the initial burden in one of two ways — by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 606-08 (11th Cir. 1991) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 153, 157, 160 (1970); Celotex Corp., 477 U.S. at 320, 322-25). If — and only if — the movant carries its initial burden, the non-movant must "demonstrate that there is indeed a material issue of fact that precludes summary judgment." Id. at 608. When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carries its initial burden. For example, if the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993). On the other hand, if the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that "was 'overlooked or ignored' by the moving party," id. at 1116 (quoting Celotex, 477 U.S. at 332 (Brennan, J., dissenting)), or "come forward with additional evidence

8

sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency," id. at 1117.  The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint.  See Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981).  Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

Here, Defendant moves for summary judgment on his counterclaim, which he carries the burden to prove at trial. Defendant also moves the Court to grant summary judgment in his favor on Plaintiff's breach of contract claim; Defendant lacks the burden at trial on Plaintiff's breach of contract claim.  (Def.'s Mot. for Summ. J., at 1.)  In reaching its conclusions herein, the Court has evaluated the Parties' briefs, other submissions, and the evidentiary record in this case.

### III. DISCUSSION

The Court must decide, first, which state's law governs the Restrictive Covenant Agreement and, second, whether the Agreement is enforceable under that state's law.

**A. Governing State's Law**

In its motion for summary judgment, Defendant fails to argue which state's law applies, instead arguing that the Restrictive Covenant Agreement is unenforceable under all potentially

applicable state laws: Connecticut, Georgia, and South Carolina. (Def.'s Mot. for Summ. J., at 4-5 ("[R]egardless of which state's law applies, the Agreement is unenforceable.").)

Because Plaintiff filed this case in Georgia, the Court looks to Georgia's choice of law requirements. See Rayle Tech, Inc. v. DEKALB Swine Breeders, Inc., 133 F.3d 1405, 1409 (11th Cir 1998). Georgia follows the rule of *lex loci contractus*, which dictates that "the validity, nature, construction, and interpretation of a contract are governed by the substantive law of the state where the contract was made." Id. (quoting Lloyd v. Prudential Sec., Inc., 438 S.E.2d 703, 704 (Ga. Ct. App. 1993)). By contract, however, parties "may stipulate that the laws of another jurisdiction will govern the transaction." Manderson & Assocs., Inc. v. Gore, 389 S.E.2d 251, 254 (Ga. Ct. App. 1989). The parties' choice of law provision will be upheld unless "the chosen jurisdiction has no substantial relationship to the parties or the transaction" or "the law is contrary to Georgia public policy." Rayle Tech, 133 F.3d at 1409 (citing Manderson & Assocs., 389 S.E.2d at 254; Velten v. Regis B. Lippert, Intercat, Inc., 985 F.2d 1515, 1519 (11th Cir. 1993)); see also Carr v. Kupfer, 296 S.E.2d 560, 562 (Ga. 1982) ("Absent a contrary public policy, this court will normally enforce a contractual choice of law clause.").

Through the choice of law provision within the Restrictive Covenant Agreement, the Parties elected Connecticut law to govern.

Thus, the Court must determine whether (1) the Restrictive Covenant Agreement has no substantial relationship to Connecticut or (2) Connecticut law is contrary to Georgia public policy.[4]

## 1. Substantial Relationship

When there is no basis for choosing to apply a state's law, Georgia courts find there is no substantial relationship between the chosen state and the parties or transaction.  For example, in Szomjassy v. OHM Corp., the court found there was no substantial relationship to Delaware when: (1) The plaintiff-employee was a Georgia citizen; and (2) The defendant-employer conducted some business in Georgia, was incorporated in Ohio, and had its principal place of business in Pennsylvania.  132 F. Supp. 2d 1041, 1047 (N.D. Ga. 2001).  On those facts, the Court found no basis for choosing Delaware law.  Id.

When one party to the agreement is domiciled or has its principal place of business in the chosen state, courts generally find there is a substantial relationship.  Olson v. CAST Management Consultants, Inc., No. 1:12-cv-01525-TCB, 2012 WL 13014929, at *2 (N.D. Ga. July 31, 2012) (applying Georgia choice of law rules) ("[The defendant-employer] is a California corporation with its principal place of business in California, and [the plaintiff-

---

[4] Although Defendant includes only minimal analysis on whether the Restrictive Covenant Agreement lacks a substantial connection with Connecticut, the Court analyzes this factor out of completeness.  (See Def.'s Mot. for Summ. J., at 4-5, 7; Def.'s Reply Supp. Mot. for Summ. J., at 2-5.)

employee] alleges that the employment agreement was drafted by [the defendant-employer]. Therefore, California has a substantial relationship to both the parties and the transaction."); Breland v. McDonald's Corp., No. 1:09-CV-0523-BBM, 2009 WL 10666356, at *7 n.9 (N.D. Ga. Dec. 31, 2009) (applying Georgia choice of law rules) (finding substantial relationship when the chosen state was the employer's principal place of business); see also Larsen v. Citibank FSB, 871 F.3d 1295, 1303 n.2 (11th Cir. 2017) (applying Washington choice of law rules) ("As the district court correctly noted, the choice of Ohio law is proper given that [the defendant-employer] is headquartered in that state."); RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187(2)(b) cmt. F (Am. Law Inst. 1971) (explaining that "the state of the chosen law" has a "substantial relationship . . . where one of the parties is domiciled or has his principal place of business"). But see H&R Block E. Enters., Inc. v. Stewart, No. 1:06-CV-1332-CAP, 2007 WL 9702228, at *2 (N.D. Ga. Jan. 5, 2007) (applying Georgia choice of law rules) (finding no substantial relationship when only connection was the employer's headquarters).

Defendant offers no assertion that Connecticut lacks a substantial relationship to the dispute. Rather, Defendant argues, "South Carolina and Georgia both have a greater relationship to the dispute." (Def.'s Mot. for Summ. J., at 4.) In response, Plaintiff offers the following examples of the

Connecticut connection: (1) Lydall, Southern Felt's parent company, has its principal place of business in Connecticut; (2) Lydall authored the first draft of the Restrictive Covenant Agreement; (3) Defendant sent the requested changes to the draft Restrictive Covenant Agreement to Mr. McDaniel, Lydall's General Counsel, in Connecticut; and (4) Mr. McDaniel received, revised, signed, and initialed the Restrictive Covenant Agreement in Connecticut. (Pl.'s Resp. Opp'n Mot. for Summ. J., at 7.)

Without attempting to distinguish the cases Plaintiff cites,[5] Defendant replies that the connections between Defendant's employment with Plaintiff and Connecticut are only "that the onboarding process for Southern Felt employees took place in Connecticut . . . and that a Lydall executive in charge of the process of having Southern Felt employees sign the Agreement was located in Connecticut." (Def.'s Reply Supp. Mot. for Summ. J., at 4.)

Given that Plaintiff's parent company is headquartered in Connecticut and the Parties negotiated the Restrictive Covenant Agreement through Mr. McDaniel in Connecticut, the Court finds Defendant has not carried his burden of showing the Parties or transaction lack a substantial connection with Connecticut.

---

[5] Defendant cites cases that applied Georgia law — the law of the forum — not based on lack of connection, but for public policy reasons. (Def.'s Reply Supp. Mot. for Summ. J., at 4-5.) As such, those cases do not help Defendant establish the Parties and transaction at issue have no substantial connection with Connecticut.

2. <u>Georgia Public Policy</u>

The Georgia Supreme Court stated, "The law of the jurisdiction chosen by parties to a contract to govern their contractual rights will not be applied by Georgia courts where application of the chosen law would contravene the policy of, or would be prejudicial to the interests, of the state." <u>Nasco, Inc. v. Gimbert</u>, 238 S.E.2d 368, 369 (Ga. 1977). "If a restrictive covenant is not enforceable under Georgia law, it is violative of Georgia's public policy and a choice-of-law provision choosing the law of a foreign jurisdiction may not be applied to enforce the covenant." <u>Boone v. Corestaff Support Servs., Inc.</u>, 805 F. Supp. 2d 1362, 1369 (N.D. Ga. 2011) (citing <u>Convergys Corp. v. Keener</u>, 582 S.E.2d 84, 85–86 (Ga. 2003)).

According to Defendant, "enforcement of the Agreement would violate Georgia's public policy." (Def.'s Mot. for Summ. J., at 7.)  Specifically, Defendant argues that both the customer non-solicitation covenant and the employee non-solicitation covenant are unenforceable as overbroad. (<u>Id.</u> at 7–11.)

The Restrictive Covenant Agreement provides: "[F]or a period of two (2) years following the termination of [Defendant's] employment," Defendant shall not:

> (i) induce or encourage any employee of [Plaintiff] to terminate his or her employment with [Plaintiff], or

> (ii) solicit, induce[,] or encourage any person, business[,] or entity which is a supplier of, a purchaser

14

from, or a contracting party with, [Plaintiff] to
terminate any written or oral agreement, order[,] or
understanding with [Plaintiff] or to conduct business in
a way that results in an adverse impact to [Plaintiff].

### a. Customer Non-Solicitation Covenant

Starting with the Customer Non-Solicitation Covenant,
Defendant believes it "goes far beyond Georgia's permissible
prohibition on customer solicitation." (Id. at 7.) Defendant
cites O.C.G.A. § 13-8-53(b), which provides:

> [A]n employee may agree in writing for the benefit of an
> employer to refrain, for a stated period of time
> following termination, from soliciting, or attempting to
> solicit, . . . any business from any of such employer's
> customers, including actively seeking prospective
> customers, with whom the employee had material contact
> during his . . . employment for purposes of providing
> products or services that are competitive with those
> provided by the employer's business.

(Def.'s Mot. for Summ. J., at 7-8.) The covenant need not specify
a geographical area. O.C.G.A. § 13-5-85(b). And, importantly,
"[a]ny reference to a prohibition against 'soliciting or
attempting to solicit business from customers' or similar language
shall be adequate for such purpose and narrowly construed to"
comply with the contours of Georgia law; namely, "to apply only
to: (1) such of the employer's customers . . . with whom the
employee had material contact[,] and (2) products or services that
are competitive with those provided by the employer's business."
Id. The Georgia statute also provides, "[A] court may modify a
covenant that is otherwise void and unenforceable so long as the

modification does not render the covenant more restrictive with regard to the employee than as originally drafted by the parties." Id. § 13-8-53(d).

According to Defendant, the Customer Non-Solicitation Covenant does not comply with Section 13-8-53(b) because the covenant: (1) Does not just cover "customers" but also "any person, business[,] or entity which is a supplier of, a purchaser from, or a contracting party with, [Plaintiff]"; (2) Does not apply to those whom Defendant had "material contact," but applies to "any person, business[,] or entity"; (3) Is overbroad by not preventing "solicitation for purposes of providing products or services that are competitive," but instead prevents Defendant "conduct[ing] business in a way that results in an adverse impact to [Plaintiff]"; and (4) Is actually, in effect, "a limitless non-compete restriction." (Def.'s Mot. for Summ. J., at 8-9.)

With his first argument, Defendant focuses on the part of the non-solicitation covenant pertaining to suppliers or other contracting parties. (Id. at 8.)  Plaintiff is correct that Defendant fails to point to any law supporting his contention that Plaintiff "could not possibly show a legitimate interest to stop [Defendant] from soliciting a supplier or contracting party." (Id.; Pl.'s Resp. Opp'n Mot. for Summ. J., at 13.)  The Georgia Code, however, defines "[l]egitimate business interest" to include "[s]ubstantial relationships with specific prospective or existing

16

customers, patients, vendors, or clients." O.C.G.A. § 13-8-51(9)(c). Just as in Interra Int'l, LLC v. Al Khafaji, Defendant "cites to no law (in Georgia or elsewhere) holding that a restriction on soliciting vendors for two years . . . is void and unenforceable." No. 1:16-CV-1523-MHC, 2017 WL 4866266, at *12 (N.D. Ga. Mar. 21, 2017) (finding vendor non-solicitation covenant enforceable under Georgia law).

Defendant distinguishes the terms vendor and supplier but declines to offer any case law to support its contention that "[i]t is hard to conceive of a scenario wherein a company like [Plaintiff] can have a legitimate interest in preventing its former employees from reaching out to suppliers." (Def.'s Reply Supp. Mot. for Summ. J., at 6, 6 n.2.) Defendant, however, fails to read the Customer Non-Solicitation Covenant in its entirety — it does not prevent Defendant from working with the same suppliers or purchasers as Plaintiff; rather, it only prevents Defendant from attempting to encourage those companies or individuals from terminating agreements with Plaintiff or conducting business in a way that negatively impacts Plaintiff. As Defendant himself notes, "suppliers sell in large volumes and will happily provide their products to anyone who will pay their listed prices." (Id. at 6-7.) Thus, Defendant acknowledges he is probably not prevented from working with the same suppliers or contracting parties as

Plaintiff because doing so likely has no negative impact on Plaintiff's business.

Addressing Defendant's second argument, O.C.G.A. § 13-8-53(b) permits non-solicitation clauses against those with whom the employee had "material contact." That fact, however, does not require courts to find unenforceable a non-solicitation covenant that fails to specify "material contact." The Georgia statute dictates that courts shall automatically narrowly construe customer non-solicitation language in a contract to apply only to customers "with whom the employee had material contact." O.C.G.A. § 13-8-53(b); see also Pan Am Dental, Inc. v. Trammell, No. CV418-288, 2020 WL 2531622, at *6 (S.D. Ga. May 18, 2020).

As to his third argument, Defendant cites cases where the court found the covenant "went beyond what was necessary to protect [the] former employer's business interests" and would prevent the "[d]efendant[-employee] from forming any kind of business relationship . . . , even if the relationship [was] completely unrelated to the services [the] [d]efendant[-employee] provided to [the plaintiff-employer]." (Def.'s Mot. for Summ. J., at 9); Matthew Focht Enters., Inc. v. Lepore, No. 1:12-cv-04479-WSD, 2013 WL 4806938, at *6 (N.D. Ga. Sept. 9, 2013) (cited by Defendant). Once again, however, the Court finds Defendant fails to read the second half of the covenant, which only prevents Defendant from soliciting, inducing, or encouraging if done for the purpose of

18

having Plaintiff's contacts "terminate any written or oral agreement, order[,] or understanding with [Plaintiff] or to conduct business in a way that results in an adverse impact to [Plaintiff]." Thus, Defendant is not prevented from forming "any kind of business relationship" and is explicitly not prevented from forming one that is "completely unrelated" to Plaintiff's business.

Lastly, Defendant's argument that the covenant is a "limitless non-compete restriction" is unfounded. (Def.'s Mot. for Summ. J., at 9-10.) The Customer Non-Solicitation Covenant does not state that Defendant is prevented from conducting business in any way that results in an adverse impact to Plaintiff. Rather, it prevents Defendant from soliciting, inducing, or encouraging Plaintiff's suppliers, purchasers, or contracting parties from (a) terminating any agreements with Plaintiff or (b) conducting business in any way that negatively impacts Plaintiff.[6] Grammatical construction rules prohibit the Court reading the covenant as stating Defendant shall not conduct business in a way that results in an adverse impact to Plaintiff. O.C.G.A. § 13-2-

---

[6] Although the Court disagrees that the covenant is ambiguous, Defendant offers an interesting argument regarding construing the ambiguity against Plaintiff as the drafter. (Def.'s Reply Supp. Mot for Summ. J., at 9.) As the Court sees it, construing the ambiguity against Plaintiff as the drafter would favor construing the covenant in a way that least restricts Defendant. Doing so, however, favors Plaintiff in the present legal proceeding because Defendant wishes the Court to find the covenant overbroad. Regardless, because the clause is not ambiguous, the Court need not carry out the nuances of this argument further.

2(6).  The  language  only  prevents  Defendant  from  soliciting,
inducing,  and  encouraging.  As  such,  Defendant  may  conduct  business
and  compete.

Defendant  also  claims  that  the  Court  may  not  "rewrite"  the
agreement.  (Def.'s  Reply  Supp.  Mot.  for  Summ.  J.,  at  10-11.)  In
support,  Defendant  cites  to  cases  discussing  unreasonably  broad
non-competition  covenants,  which  are  treated  more  strictly  than
non-solicitation  covenants.  Compare  O.C.G.A.  §  13-8-53(a),  with
id.  §  13-8-53(b);  see  also  LifeBrite  Labs.,  LLC  v.  Cooksey,  No.
1:15-CV-4309-TWT,  2016  WL  7840217,  at  *5,  *7  (N.D.  Ga.  Dec.  9,
2016)  (stating  that  both  the  non-solicitation  and  non-competition
clauses  are  overly  broad  but  finding  the  former  enforceable  through
narrow  construction  —  as  required  by  the  statute  —  and  the  latter
unenforceable  because  the  court  may  not  "rewrite  contracts  by
supplying  new  and  material  terms  from  whole  cloth").  Defendant
provides  no  examples  of  a  court  finding  a  non-solicitation
agreement  unenforceable  under  O.C.G.A.  §  13-8-53.  And,  as  stated
above,  as  long  as  the  modification  does  not  render  further
restriction  on  the  employee,  a  court  may  modify  a  void  and
unenforceable  covenant.  O.C.G.A.  §  13-8-53(d).  The  court  in
PointeNorth  Ins.  Grp.  v.  Zander,  explained  that  prior  to
legislation  that  went  into  effect  in  2011,  Georgia  courts  would
void  an  entire  contract  if  there  was  "one  faulty  covenant,"  but,
after  those  legislative  changes,  courts  could  blue  pencil

overbroad restrictive covenants. No. 1:11-CV-3262, 2011 WL 4601028, at *3 (N.D. Ga. Sept. 30, 2011) (remedying the overbroad non-solicitation covenant that extended "to 'any of the [e]mployer's clients' — not just the ones with whom [the defendant] interacted — . . . by blue penciling the provision to only apply to customers that the [d]efendant contacted and assisted"). The Court narrowly construes the customer non-solicitation agreement as required by the statute and finds it does not violate Georgia's public policy.

b. *Employee Non-Solicitation Covenant*

As to the employee non-solicitation covenant, Defendant states it is unenforceable because it: (1) Lacks a territorial restriction; (2) Applies to all employees of Plaintiff, not just those known to Defendant or with whom Defendant had contact; and (3) Prohibits Defendant from encouraging employees to leave Plaintiff's employ "in any capacity, not just to accept a position that would be competitive with [Plaintiff]." (Def.'s Mot. for Summ. J., at 10.)

"Restrictive covenants addressing solicitation of employees are enforceable when they are 'reasonably limited in time' and not fatally 'vague or ambiguous.'" Heartland Payment Sys., LLC v. Stockwell, 446 F. Supp. 3d 1275, 2020 WL 1129861, at *5 (N.D. Ga. 2020) (quoting CMGRP, Inc. v. Gallant, 806 S.E.2d 16, 20 (Ga. Ct. App. 2017)). Although not challenged, the Court notes that Georgia

21

courts have upheld employee non-solicitation covenants with a two-year time period.  Sunstates Refrigerated Servs., Inc. v. Griffin, 449 S.E.2d 858, 859, 860 (Ga. Ct. App. 1994); U3S Corp. of Am. v. Parker, 414 S.E.2d 513, 515, 516 (Ga. Ct. App. 1991).

Turning to Defendant's specific challenges, employee non-solicitation covenants have been upheld when they lacked a geographic limitation.  See Gallant, 806 S.E.2d at 21, 21 n.15 (collecting cases).  Also, Georgia courts have approved covenants restricting the employee from soliciting any of the employer's employees, not just those with whom the employee had material contact.  Id. at 21-22 ("We have repeatedly upheld employee non-recruitment provisions that were not limited to employees with whom the former employee had an established relationship."); U3S Corp., 414 S.E.2d at 516; see also Heartland Payment Sys., 2020 WL 1129861, at *5 (upholding covenant that restricted "soliciting, recruiting, enticing, or hiring an[y] of [the plaintiff-employer]'s employees to work for a third party").  Lastly, Georgia courts have found restrictions reasonable when they generally prohibit soliciting employees to leave the employment of the plaintiff-employer.  Gallant, 806 S.E.2d at 20, 21-22 (upholding covenant that prohibited, in part, "(ii) induc[ing] or encourage[ing] any such employee of the [plaintiff-employer] to leave the employment of the [plaintiff-employer] or to join any other company . . . or (iv) otherwise interfer[ing] with the

22

relationship between the [plaintiff-employer] and any employee of the [plaintiff-employer]"); U3S Corp., 414 S.E.2d at 516 ("We do not believe that the phrase 'or in any manner encourages employees of the [plaintiff-employer] to leave' is so vague or ambiguous as to be unenforceable.").

Based on the above precedent, the employer non-solicitation agreement does not facially violate Georgia public policy when it extends for two years after Defendant resigned and prohibits Defendant from inducing or encouraging any of Plaintiff's employees from terminating his or her employment with Plaintiff. Because Defendant has not shown the restrictive covenants violate Georgia's public policy, the Court finds no reason to ignore the Parties' choice of Connecticut law.

## B. Enforceable Agreement Under Connecticut Law

Defendant argues that, under Connecticut law, the Restrictive Covenant Agreement is unenforceable for lack of consideration. (Def.'s Mot. for Summ. J., at 5-6.) According to Defendant, continued at-will employment is insufficient consideration. (Id.) Plaintiff disagrees and proffers support that shows continued at-will employment is sufficient consideration under Connecticut law and, even if not, additional consideration supported the Restrictive Covenant Agreement. (Pl.'s Resp. Opp'n Mot. for Summ. J., at 10-12.)

Connecticut courts acknowledge, "[T]he Connecticut Supreme Court has long recognized that continued employment may suffice as adequate consideration to support a covenant in an at-will employment relationship." Tourmaline Partners, LLC v. Monaco, No. 3:13-CV-00108 (VAB), 2016 WL 614361, at *10 (D. Conn. Feb. 16, 2016) (quoting MacDermid, Inc. v. Raymond Selle & Cookson Grp. PLC, 535 F. Supp. 2d 308, 316 (D. Conn. 2008) (citing Dolak v. Sullivan, 144 A.2d 312, 316 (Conn. 1958); Roessler v. Burwell, 176 A. 126, 127 (Conn. 1934)). Even if continued employment is insufficient, however, there is a genuine dispute as to whether Defendant received other consideration supporting the Restrictive Covenant Agreement. Cf. Tourmaline Partners, 2016 WL 614361, at *10.

The Restrictive Covenant Agreement defines the consideration as "[Defendant's] continued employment by [Plaintiff]" and "the compensation and other benefits to be received by [Defendant] from [Plaintiff]." (Restrictive Covenant Agreement, at 3.) The record contains competing facts as to whether Plaintiff provided "other benefits to" Defendant as consideration.

Lydall acquired Plaintiff's stock in February of 2014. Thereafter, Lydall granted Plaintiff stock six times, the first three of which fully vested and were granted on February 21, 2014, December 5, 2014, and December 4, 2015. Defendant signed the Restrictive Covenant Agreement on December 18, 2014. Defendant

argues that because "he had already received his stock awards for 2014" and "did not receive any additional stock awards until December 4, 2015[,]" receiving stock could not be consideration for the Restrictive Covenant Agreement because his receipt of the stock was not conditioned on signing. (Def.'s Mot. for Summ. J., at 6.) Plaintiff seems to argue that the February 2014 stock grant was different than the yearly grant in December.[7] It is true that Defendant acknowledged receipt of the Restrictive Covenant Agreement in September of 2014 and, thereafter, negotiated changes in the Restrictive Covenant Agreement with Lydall before ultimately signing on December 18, 2014. The December 5, 2014, stock also only vested after three years of continued employment. Although Defendant signed the Restrictive Covenant Agreement after receiving the December 2014 stock grant, given the timing of events surrounding the grant of stock and the vesting schedule, a genuine dispute exists as to whether the stock receipt in December of 2014 served as consideration for the Restrictive Covenant Agreement.

As consideration, Plaintiff also raises the fact that it gave Defendant a 17% pay raise equaling $22,769.77, which was approved the same day Defendant executed the Restrictive Covenant Agreement. Plaintiff states that this pay raise was "in addition to the normal merit increase of 3% or $4[,]018.55." (Pl.'s Resp.

---

[7] Plaintiff shows, "The February 21, 2014 restricted stock grant was only given to specific members of management . . . . It had a more advantageous vesting schedule."

Opp'n Mot. for Summ. J., at 12.)   Plaintiff also argues Defendant received additional benefits, including "car allowance payments, medical/dental benefits, wellness reimbursements for fitness equipment for he and his wife, and a company gas card."   In his reply, Defendant neglects to oppose Plaintiff's arguments concerning the pay raise and additional benefits.   These additional benefits generate further dispute as to the consideration issue. As such, the Court is unable to find the Restrictive Covenant Agreement unenforceable for failure of consideration as a matter of law; thus, summary judgment is inappropriate.

## IV. CONCLUSION

For the foregoing reasons, Defendant's partial motion for summary judgment (Doc. 26) is **DENIED**.[8]   All claims in this action shall proceed to trial in due course.

**ORDER ENTERED** at Augusta, Georgia, this 31st day of August, 2020.

J. RANDAL HALL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

---

[8] The Court repeats that Defendant's motion for a hearing (Doc. 48) is **DENIED**. See *supra* note 1.

26